## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAMILAH JOLLY, *individually and on behalf of all others similarly situated,* )<br>)<br>) | |
| )<br>Plaintiff, )<br>) | Case No. 1:24-cv-6401 |
| v. )<br>) | **JURY TRIAL DEMANDED** |
| FURTHERED, INC. d/b/a LAWLINE, )<br>)<br>) | |
| Defendant. ) | |

## CLASS ACTION COMPLAINT

Plaintiff Kamilah Jolly brings this class action lawsuit, on behalf of herself and all other persons similarly situated, against FurtherEd, Inc. d/b/a Lawline ("Lawline" or "Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's allegations are made further to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This case is a consumer digital privacy class action lawsuit against Lawline for violating the VPPA by disclosing its digital subscribers' personally identifiable information in the form of video viewing history and services ("Personal Viewing Information") to Facebook and other third parties without proper consent.

2.    The VPPA prohibits "video tape service providers," such as Lawline, from knowingly disclosing consumers' personally identifiable information including "information which identifies a person as having requested or obtained specific video materials or services from

a video tape provider," without express consent in a stand-alone consent form. *See* 18 U.S.C. § 2710(a)(3).

3.      Lawline is the leading provider of online continuing legal education ("CLE") offering courses to attorneys in all 50 states.[1] Lawline markets and sells to attorneys access to its digital library so that they may earn continuing legal education credits by viewing videos on its website, www.lawline.com ("Website") and through its mobile app.[2] According to Lawline, it currently has 160,000 members and offers over 2,000 video courses.[3]

4.      Legal professionals who utilize Lawline CLE offerings ("Users") can explore courses via a free trial or sign up for one of Defendant's CLE plans, ranging in price from $229 to 4899 a year.

5.      Through the use of analytics tools, Lawline tracks and discloses to third-party business partners, its Users' Personal Viewing Information and, most notably, unique identifying information along with requested or obtained video content. This occurs even when the User has not shared (nor consented to share) such information.

6.      Importantly, Lawline shares the Personal Viewing Information—*i.e.*, its Users' unique ID and video content viewed together—as one data point meaning that any ordinary person

---

[1] *See* https://www.linkedin.com/company/lawline.com

[2] Absent discovery, Plaintiff is unable to independently confirm whether Defendant installed third-party tracking technologies on its mobile app and/or any other digital platforms owned, controlled, and/or operated by Lawline. However, given the presence of such trackers on the Lawline Website, Plaintiff alleges, upon information and good faith belief, that Defendant is capturing and sharing its Users' Personal Viewing Information via the mobile app as well.

[3] *See* https://www.lawline.com/info/about-us

can use it to quickly and easily locate, access and view Users' corresponding account(s) and/or profile(s).

7.      Lawline's disclosures allow third parties to know the video viewing history and services one of its Users viewed on Lawline's Website.

8.      Without informing its Users, Lawline profits from its unauthorized disclosure of its Users' Personal Viewing Information to third parties. It does so at the expense of its Users' privacy and their statutory rights under the VPPA.

9.      Because Lawline Users are ***not*** informed about this collection and disclosure of their Personal Viewing Information—as it is automatic and invisible—they cannot make informed decisions as to which, if any, videos to watch nor take any proactive measures to defend themselves against the highly personal ways Lawline has used and continues to use the data it has about them to make money for itself.

10.     Lawline chose to disregard Plaintiff's and millions of others of its Users' statutorily protected privacy rights by releasing their sensitive data to third parties.

11.     Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Lawline's practices of intentionally disclosing its Users' Personal Viewing Information to Facebook or any other third parties in knowing violation of VPPA.

## **PARTIES**

12.     Plaintiff Kamilah Jolly is, and has been at all relevant times, a resident of Orlando, Orange County, Florida, and intends to remain there, and is, therefore, a resident of Florida.

13.     Defendant FurtherEd, Inc. d/b/a Lawline is a New York corporation with its principal place of business at 228 Park Ave S, Suite 81742 in New York, New York 10003.

3

14. Defendant owns and operates its website, available at www.lawline.com, which is used throughout the United States.

## JURISDICTION AND VENUE

15. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the claims that arise under the VPPA, 18 U.S.C. § 2710.

16. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000 and at least one member of the Class is a citizen of a state different from that of Defendant.

17. This Court has personal jurisdiction over Defendant because Defendant is incorporated and has its principal place of business in the State of New York.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is situated in this District and a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## FACTUAL BACKGROUND

**I.      The Background of the VPPA.**

19. The VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

20. The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to

its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

21.     Senators at the time the VPPA was passed were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon & Leahy, respectively).

22.      In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests, and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

23.     While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before.

24.     During a recent Senate Judiciary Committee meeting, "*The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*," Senator Leahy emphasized the point by stating: "[w]hile it is true that technology has changed over the years, we must stay faithful

to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[4]

25.     In this case, Lawline chose to deprive Plaintiff and the Class members of that right by knowingly and systematically disclosing their Personal Viewing Information to unauthorized third parties without providing notice to (let alone obtaining consent from) anyone, as explained herein.

**II.     Lawline's Digital Subscriptions.**

26.     To register for Lawline's CLE courses, Users create a profile and account with Defendant.

27.     Lawline Users provide their personal information, including but not limited to their name, email address, address or postal code, and payment method(s).

28.     Lawline's lectures and courses are available as videos online and on a broad range of devices, including mobile phones.

29.     On information and belief, all Users provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

30.     When opening an account, Lawline does not adequately disclose to its Users that it will share their Personal Viewing Information with third parties. Users are also not asked to consent to such information sharing upon opening an account.

---

[4] *See* Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century.

31.    After becoming a digital subscriber, viewers have access to a variety of Lawline lectures through Lawline's website or app.

32.    Notably, once a User signs in and watches a Lawline lecture, the User is not provided with any notification that their Personal Viewing Information is being shared.

33.    Defendant also fails to obtain Users' written consent to collect and disclose their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**III.    Lawline Fails to State It Disclose Personal Viewing Information, as Required under the VPPA.**

34.    Defendant's operative privacy policy states that "[L]awline respects the confidentiality of visitors to its site. Any data relating to individuals visiting Lawline will not be used in any way that violates the visitor's privacy or confidences."[5]

35.    The circumstances under which Defendant states that it may disclose a User's personal information do not include the disclosure of Personal Viewing Information to third parties like Facebook.

36.    As the privacy policy states: "[L]awline may disclose personally identifiable information under special circumstances, such as to comply with subpoenas or when your actions violate the Terms of Service."[6]

37.    Nowhere in Lawline's privacy policy does Defendant disclose that it will share Users' private and protected Personal Viewing Information.

---

[5]    https://web.archive.org/web/20211126133637/https://www.lawline.com/info/privacy-policy (Nov. 26, 2021).

[6] *Id.*

IV.    **Facebook and the Facebook Tracking Pixel.**

38.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users. Facebook describes itself as a "real identity platform,"[7] meaning users are allowed only one account and must share "the name they go by in everyday life."[8] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

39.    Facebook sells advertising space by highlighting its ability to target users.[9] Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[10] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

40.    They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Facebook Tracking Pixel.

---

[7] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[8] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[9]    WHY    ADVERTISE    ON    FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[10] AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[11] EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

41.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[12] When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

42.     Facebook also uses unique and persistent identifiers that are assigned to each user. The Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile. With a user's Facebook ID ("FID"), Facebook and any ordinary person can look up user's profiles.

43.     Lawline installed the Tracking Pixel on its website, which discloses Plaintiff's and Class Members' Personal Viewing Information to Facebook, because Lawline benefits financially from the advertising and information services that stem from use of the Tracking Pixel.

44.     When a Lawline User enters the website or other streaming product and watches videos on the website, Defendant discloses certain information about the viewer including, but not limited to, their identity and the media content the User watched, to Facebook. Specifically, Lawline sends the video content name and, most notably, the viewers' unique ID to third parties.

45.     When a Facebook user with one or more personally identifiable FID cookies on their browser views videos on the Website, that product, through its computer code, causes the user's identity and viewed videos to be transmitted to Facebook.

46.     This transmission is not the Users' decision but results from Defendant's purposeful use of its Facebook tracking pixels by incorporation of those pixels and code into the

---

[12] RETARGETING, https://www.facebook.com/business/goals/retargeting.

Website. Defendant could easily program the Pixel so that this information is not automatically transmitted to Facebook when a subscriber views videos.

47.     Facebook can easily identify any individual on its Facebook platform with only their unique FID, as can any ordinary person who comes into possession of an FID.

48.     Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the Users—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on the website.

49.     At all relevant times, Lawline knew that the Facebook Pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the Pixel, including that it enabled Defendant to show targeted advertising to its Users based on the products those Users had previously viewed on the Website.

## V.    Lawline Unlawfully Discloses Its Users' Personal Viewing Information to Unauthorized Third Parties.

50.     Defendant describes its CLE service as delivering "high-quality, engaging content that will draw you in, challenge your mind, and satisfy your CLE requirements."[13]

51.     To access its content, Users must enroll with Lawline and pay a fee of up to $899.[14]

52.     Lawline's Website hosts the Facebook Tracking Pixel and transmits PageView data and other events to Facebook, which include descriptive Uniform Resource Locators ("URL") dedicated solely to Lawline video lectures.

---

[13] https://www.lawline.com/info/about-us.

[14] https://www.lawline.com/subscription.

53.     Lawline is ***not*** sharing anonymized, non-personally identifiable data with third parties like Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific users. Defendant has thus monetized its database by disclosing its Users' Personal Viewing Information to third parties in a manner allowing it to make a direct connection—without the consent of its Users and to the detriment of their legally protected privacy rights.

54.     Critically, the Personal Viewing Information Defendant discloses to Facebook allows third parties, like Facebook, to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

55.     For instances, as shown in the screenshot below, when a User navigates to the website and views a video, Defendant discloses to Facebook the Personal Viewing Information to Facebook.

***Figures 1, 2 & 3: Examples of a HTTP single communication session sent from the customer's device to Facebook that reveals the fact that the user is viewing the online video "The Impact of Artificial Intelligence on Employment Litigation" and the customer's unique personal identifiers including the FID (c_user field)***





56.    Lawline also discloses, through a Facebook event named "Time on Page 10 Sec" information regarding how long a User is on the webpage that plays the online video content:



57.    As a result of Lawline's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own profit the Personal Viewing Information of Defendant's Users, together with additional sensitive personal information.

58.    Lawline does not seek its Users' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to unauthorized third parties.

59.    By disclosing its Users' Personal Viewing Information to unauthorized third parties—which undeniably reveals their identity and the specific video materials they requested from Defendant's website—Defendant has intentionally and knowingly violated the VPPA.

60.    In addition, www.lawline.com collects the code for at least five different Facebook cookies:



61.     When someone who is logged into Facebook watches a video on Lawline's Website, the Pixel transmits personally identifiable information from these Facebook cookies to Facebook along with their PageView data. For instance, the c_user cookie contains a visitor's Facebook ID.

62.     A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of facebook.com.

63.     The combination of the PageView data and the information from Facebook's cookies embedded on Lawline's Website permits Facebook to identify exactly who watched a specific video.

64.     Defendant does not disclose that the Facebook Pixel or any other tracking technology embedded in the Website's source code track, record, and transmit Plaintiff's and Class Members' Private Information to Facebook and other third parties.

## PLAINTIFF'S EXPERIENCE

65.     Plaintiff Jolly was a digital subscriber of Lawline from approximately late 2019 to February 2022.

66.     Plaintiff became a User of Lawline by providing, among other information, her name, address, email address, IP address (which informs Defendant as to the city and zip code she resides in as well as her physical location), and any cookies associated with her devices.

67.     As part of Plaintiff's subscription, she received emails and other communications from Lawline.

68.     Plaintiff has had a Facebook account since approximately 2016.

69.     During the relevant time period, Plaintiff used her Lawline digital subscription to view videos and related services through the Lawline Website, https://www.lawline.com/, while logged into her Facebook account.

70.     From approximately March 2020 to February 2022, Plaintiff viewed videos via Lawline's Website.

71.     When Plaintiff watched videos through Lawline, Defendant disclosed her event data, which recorded and disclosed the video's title to Meta. Defendant also disclosed identifiers for Plaintiff Jolly including the c_user and fr cookies to Meta.

72.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to third parties.

73.     Plaintiff has never been provided any written notice that Defendant discloses her User's Personal Viewing Information or any means of opting out of such disclosures of her Personal Viewing Information.

74.     Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to third parties.

75.     Because Plaintiff is entitled by law to privacy in her Personal Viewing Information,

Defendant's disclosure of her Personal Viewing Information deprived Plaintiff of the full set of benefits to which she is entitled.

## TOLLING, CONCEALMENT & ESTOPPEL

76.     The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

77.     Defendant secretly incorporated the Facebook Tracking Pixel into its Website, providing no indication to Users that their Personal Viewing Information would be disclosed to unauthorized third parties.

78.     Defendant had exclusive knowledge that the Facebook Tracking Pixel was incorporated on its Website, yet failed to disclose that fact to Users, or inform them that by watching videos on the Website Plaintiff's and Class Members' Personal Viewing Information would be disclosed to third parties, including Facebook.

79.     Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the Facebook Tracking Pixel is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Facebook to intercept Users' Personal Viewing Information.

80.     As alleged above, Defendant had a duty to disclose the nature and significance of its data disclosure practices, including the disclosure of Users' Personal Viewing Information but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

81.    Plaintiff did not discover that Defendant disclosed her Personal Viewing Information to unauthorized third parties until August 2024, after contacting undersigned counsel and discussing potential claims against Defendant.

## CLASS ALLEGATIONS

82.    **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who: (i) were registered users of an online website, mobile application and/or any video-on-demand service or application owned, controlled, and/or operated by Lawline and (ii) who viewed videos on an online website, mobile application, or any video-on-demand service or application owned, controlled, and/or operated by Lawline.

83.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

84.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class and Subclass is believed to be so numerous that joinder of all members is impractical. And such information is available to Defendant.

85.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a) whether Defendant collected Plaintiff's and the Class's personally identifiable information and video viewing activity;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' personally identifiable information and video viewing activity in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class's personally identifiable information and video viewing activity without consent.

86.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class and Subclass because Plaintiff, like all members of the Class and Subclass, used Defendant's Website to watch videos, and had her personally identifiable information and video viewing activity collected and disclosed by Defendant.

87.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class and Subclass. Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class or Subclass. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclass, additional claims as may be appropriate, or to amend the definition of the Class and Subclass to address any steps that Defendant took.

88.    **Superiority (Fed. R. Civ. P. 23 (b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclass is impracticable. Even if every member of the Class and Subclass could afford to pursue individual litigation, the court system could not. It would

be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclass. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710, *et seq.*
### (*On behalf of Plaintiff & the Class*)

89.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

90.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

91.    Defendant is a "video tape service provider" because it has created, hosted, and delivered hundreds of videos on its Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

92.    Plaintiff and members of the Class are "consumers" because they enrolled in continuing education and test preparation courses on Defendant's website. 18 U.S.C. § 2710(a)(1). This makes them a "subscriber" and therefore a "consumer" under the VPPA.

93.    75.    As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

94.    Defendant knowingly caused Personal Viewing Information concerning Plaintiff and Class Members to be disclosed to unauthorized third parties, including Facebook.

95.    This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class Member to Facebook and other third parties, as an individual who viewed Lawline's videos, including the specific video materials requested from the website.

96.    Defendant utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, including information about the videos she viewed.

97.    As set forth in 18 U.S.C. § 27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner."

98.    Defendant failed to obtain informed, written consent under this definition from Plaintiff and Class Members.

99.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.

100.    Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

101.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."

102.    Defendant failed to provide an opportunity to opt out as required by the VPPA.

103.    Defendant knew that its disclosures identified Plaintiff and Class Members to third parties. Defendant also knew that Plaintiff's and Class Members' Personal Viewing Information was disclosed to third parties, because, *inter alia*, Defendant chose, programmed, and intended for those third parties to receive the video content name, and, most notably, the Users' specific, unique ID, including their Facebook ID.

104.    By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

105.    As a result of the above violations, Defendant is liable to the Plaintiff and Class Members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff."

106.    Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: August 23, 2024                              Respectfully submitted,

                                                    *s/: David S. Almeida*
                                                    David S. Almeida
                                                    New York Bar No. 3056520
                                                    Matthew J. Langley
                                                    New York Bar No. 4831749
                                                    **ALMEIDA LAW GROUP LLC**
                                                    849 W. Webster Avenue
                                                    Chicago, Illinois 60614
                                                    Tel: (312) 576-3024
                                                    E: david@almeidalawgroup.com
                                                    E: matt@almeidalawgroup.com

                                                    ***Counsel for Plaintiff & the Putative Class***