**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KAMILAH JOLLY; DIEGO ALVAREZ-MIRANDA EZPELETA; and VAUGHN BOBB-WILLIS; individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br>    v.<br><br>FURTHERED, INC. d/b/a LAWLINE, INC.,<br><br>            Defendant. | Case No. 1:24-cv-06401-LJL<br><br>(*consolidated with Case No. 1:24-cv-06709*)<br><br>Hon. Lewis J. Liman |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................ 2

    A.    Defendant ................................................................................................. 2

    B.    Plaintiffs ................................................................................................... 3

        1.    Plaintiff Kamilah Jolly ................................................................ 3

        2.    Plaintiff Diego Alvarez-Miranda Ezpeleta ................................. 4

        3.    Plaintiff Vaughn Bobb-Willis ...................................................... 4

    C.    Alleged Statutory Violations ................................................................... 6

III.    LEGAL STANDARD .......................................................................................... 6

    A.    Rule 12(b)(1) ............................................................................................ 6

    B.    Rule 12(b)(6) ............................................................................................ 7

IV.    ARGUMENT ....................................................................................................... 8

    A.    Plaintiffs Lack Standing .......................................................................... 8

    B.    Plaintiffs Fail to Properly Allege a Violation of the VPPA ................... 10

        1.    Plaintiffs Fail to Allege That Lawline *Knowingly* Transmitted PII. ......... 10

        2.    The SAC Fails to Allege Plaintiffs' Facebook Profiles Identify Them Individually or Are Public. ............................................. 13

        3.    Information at Issue is Not PII Because It Does Not Identify "Specific Video Materials or Services." .................................... 15

        4.    The SAC Fails to Establish That An Ordinary Person Would Be Able to Identify Plaintiffs' Facebook Accounts With an FID. ................. 20

    C.    Plaintiffs' Consent Was Obtained Via Lawline's Terms & Conditions And Privacy Policy. ................................................................................. 22

V.    CONCLUSION .................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*APWU v. Potter*,
    343 F.3d 619 (2d Cir. 2003)...................................................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................7

*Atl. Recording Corp. v. Project Playlist, Inc.*,
    603 F. Supp. 2d 690 (S.D.N.Y. 2009)...................................................................7

*Austin-Spearman v. AMC Network Entm't LLC*,
    98 F. Supp. 3d 662 (S.D.N.Y. 2015)..................................................................8, 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................7

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
    No. 17-CV-04570 (LAK) (KHP),
    2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) .....................................................11

*Boelter v. Hearst Commc'ns, Inc.*,
    269 F. Supp. 3d 172 (S.D.N.Y. 2017)...................................................................6

*Broidy Cap. Mgmt. LLC v. Benomar*,
    944 F.3d 436 (2d Cir. 2019).................................................................................6

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 477 (2d Cir. 2016).................................................................................6

*Corbett v. Firstline Sec., Inc.*,
    687 F. Supp. 2d 124 (E.D.N.Y. 2009) .................................................................22

*Derbaremdiker v. Applebee's Int'l, Inc.*,
    No. 12-CV-01058(KAM),
    2012 U.S. Dist. LEXIS 138596 (E.D.N.Y. Sept. 26, 2012)....................................7

*Edwards v. Learfield Commc'ns, LLC*,
    697 F. Supp. 3d 1297 (N.D. Fla. 2023).................................................14, 20, 21

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) ...................................................................8, 18, 19

*Executive Plaza, LLC v. Peerless Ins. Co.*,
    5 N.E.3d 989 (N.Y. Ct. App. 2014) ....................................................................22

*Ghanaat v. Numerade Labs, Inc.*,
    689 F. Supp. 3d 714 (N.D. Cal. 2023) ...............................................................14

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
    988 F.3d 114 (2d Cir. 2021) ...............................................................................6

*Heerde v. Learfield Commc'ns, LLC*,
    741 F. Supp. 3d 849 (C.D. Cal. 2024) .........................................................14, 15

*In re Facebook Internet Tracking Litig.*,
    263 F. Supp. 3d 836 (N.D. Cal. 2017) ..............................................................12

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    806 F.3d 125 (3d Cir. 2015).............................................................................12

*In re Hulu Privacy Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) .........................................................10, 11

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d 262 (2016).............................................................................18, 19, 20

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)..................................................................7

*In re Pharmatrak, Inc. Privacy Litig.*,
    329 F.3d 9 (1st Cir. 2003)................................................................................12

*Katz v. Donna Karan Co., L.L.C.*,
    872 F.3d 114 (2d Cir. 2017)...............................................................................6

*Liberian Cmty. Ass'n of Conn. v. Lamont*,
    970 F.3d 174 (2d Cir. 2020)...............................................................................6

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................6

*Martin v. Meredith Corp.*
    657 F. Supp. 3d 277 (S.D.N.Y. 2023).........................................................16, 17

*Robinson v. Disney Online*,
    152 F. Supp. 3d 176 (S.D.N.Y. 2015).........................................................10, 17

*Robinson v. Gov't of Malay.*,
    269 F.3d 133 (2d Cir. 2001)...............................................................................6

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).................................................................................7

*Santana v. Take-Two Interactive Software, Inc.*,
  717 F. App'x 126 (2d Cir. 2017) ..............................................................9

*Sira v. Morton*,
  380 F.3d 57 (2d Cir. 2004)......................................................................7

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017) ..................................................13

*Smith v. Facebook, Inc.*,
  745 F. App'x 8 (9th Cir. 2018) .............................................................13

*Smith v. Trinity Broad. of Texas, Inc. et al*,
  No. 8:24-CV-01046-JVS-ADS,
  2024 U.S. Dist. LEXIS 176039 (C.D. Cal. Sept. 27, 2024)....................14

*Solomon v. Flipps Media, Inc.*,
  No. 22-cv-5508 (JMA) (JMW),
  2023 U.S. Dist. LEXIS 176480 (E.D.N.Y. Sept. 30, 2023)....................14

*Sterk v. Redbox Automated Retail, LLC*,
  770 F.3d 618 (7th Cir. 2014) ..................................................................8

*Thorn v. Formula 1 Motorsports, Inc.*,
  No. 19-cv-1077 (JPO),
  2019 U.S. Dist. LEXIS 220080 (S.D.N.Y. Dec. 19, 2019) ......................7

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008)...................................................................10

*Wilson v. Triller, Inc.*,
  598 F. Supp. 3d 82 (S.D.N.Y. 2022)......................................................11

**Statutes**

18 U.S.C. § 2710.................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b) ........................................................................1, 6, 7

## I.    INTRODUCTION

Defendant FurtherEd, Inc. d/b/a Lawline ("Defendant") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Second Amended Class Action Complaint ("SAC") filed by Plaintiffs Kamilah Jolly, Diego Alvarez-Miranda Ezpeleta, and Vaughn Bobb-Willis (collectively, "Plaintiffs") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), with prejudice. Plaintiffs' SAC asserts a claim under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, alleging that Defendant unlawfully disclosed personally identifiable information ("PII") to Meta through the use of the Meta Pixel on its website, Lawline.com. Specifically, Plaintiffs claim that Lawline transmitted their Facebook ID ("FID"), subscription status, and video viewing information to Meta. Dkt. 31, ¶ 3. However, Plaintiffs' claims fail as a matter of law.

Defendant Lawline is an online provider of continuing legal education services for attorneys. Attorneys who visit Lawline's website can watch educational videos for CLE credit, review their CLE requirements, read blog content, and access a lawyer directory, among other features.

First, Plaintiffs lack Article III standing because they fail to allege a concrete and particularized injury-in-fact. The SAC relies on speculative assertions, not well-pleaded facts demonstrating actual harm from the alleged disclosures. As the Declaration of Richard Hernandez ("Hernandez Decl.") confirms, Lawline did not knowingly transmit users' video viewing history or PII to Meta. The SAC also fails to establish that Plaintiffs were logged into Facebook when visiting Lawline's site—an essential prerequisite for any alleged data transmission via the Meta Pixel.

Second, Plaintiffs fail to state a claim under the VPPA. The statute applies only to businesses engaged in the rental, sale, or delivery of video content. Plaintiffs have failed to show how Lawline—an online continuing legal education provider—is a "video tape service provider" under the VPPA. Furthermore, an alleged transmission of an FID does not constitute PII because an FID alone does not inherently identify an individual or disclose specific video viewing history.

Third, even if any data was transmitted to Meta via the Meta Pixel, Plaintiffs fail to allege that Lawline *knowingly* disclosed their video viewing information. The VPPA requires actual knowledge of disclosure, not mere awareness that a tracking tool exists on a website. Plaintiffs' allegations rest on speculation that Lawline's use of the Meta Pixel resulted in unlawful disclosures.

Fourth, Plaintiffs' claims are time-barred. The VPPA has a two-year statute of limitations, and Plaintiffs allege violations spanning multiple years without justifying tolling. Additionally, Lawline's Terms and Conditions, which Plaintiffs agreed to upon using the website, include a one-year contractual limitations period, further barring their claims.

Plaintiffs have already amended their complaint twice, yet they have failed to cure the fundamental deficiencies in their allegations. Plaintiffs' continued inability to present a viable claim demonstrates that another amendment would be futile. For these reasons, the Court should dismiss Plaintiffs' Second Amended Complaint, with prejudice.

## II.     FACTUAL BACKGROUND

### A.     Defendant

Defendant Lawline is headquartered in New York, New York. Dkt. 31, ¶ 29.  Lawline is a website that offers over 2,000 continuing legal education courses for attorneys. *Id.* ¶ 30.  Lawline also offers a blog that provides updates on practice tips, attorney well-being, CLE compliance, and

more.[1] Lawline also hosts the "Lawyers Who Learn" podcast, which features interview with legal professionals discussing their learning methods.[2]

### B.     Plaintiffs

#### 1.     Plaintiff Kamilah Jolly

Contrary to the SAC, Plaintiff Kamilah Jolly ("Plaintiff Jolly") became a paid member of Lawline in 2014. Hernandez Decl. ¶ 15. As part of her registration, she affirmatively agreed to Lawline's Terms & Conditions and Privacy Policy, which govern the collection and use of customer information. *Id.* In 2017, Plaintiff Jolly unsubscribed from Lawline's email communications but continued her paid subscription, accessing Lawline's content for an additional five years before canceling her subscription in February 2022. Dkt. 31, ¶ 9; Hernandez Decl. ¶ 15. Plaintiff Jolly alleges that, during the relevant time period, she accessed Lawline's content while logged into her Facebook account. Dkt. 31, ¶ 10. However, the SAC fails to specify whether she accessed Lawline's prerecorded CLE courses on the same web browser and device through which she (and not another user) was logged into her Facebook account. *Id.* ¶¶ 10-11. She also does not state whether any browser settings, extensions, or other components may have blocked or restricted the Meta Pixel's ability to track her activity. *Id.* ¶¶ 7-14.

Plaintiff Jolly also alleges that she first discovered the purported disclosure of her video viewing history to Meta in August 2024—more than two years after canceling her subscription. *Id.*, ¶12. However, she does not specify any steps taken to investigate Lawline's data-sharing policies prior to August 2024, and neither does Plaintiff Jolly allege any concrete harm, financial loss, or misuse of her information as a result of the alleged information disclosure. *Id.*, ¶¶ 7-14.

---

[1] *See* Lawline Blog Home page, available at https://blog.lawline.com/ (last visited February 25, 2025).
[2] *See* David Schnurman, *Lawyers Who Learn*, available at https://www.lawline.com/podcast/lawyers-who-learn/ (last visited February 25, 2025).

### 2.     Plaintiff Diego Alvarez-Miranda Ezpeleta

Plaintiff Diego Alvarez-Miranda Ezpeleta ("Plaintiff Ezpeleta") never paid for a subscription to Lawline.com. Hernandez Decl. ¶ 16. Plaintiff Ezpeleta accessed Lawline's services through a <u>free trial</u> account in 2021 and subsequently received a <u>one-year scholarship</u> for a subscription, which Lawline granted as a courtesy based on Plaintiff Ezpeleta's representation of his finances. *Id.* His subscription ended on November 2, 2022. *Id.*; Dkt. 31, ¶ 17.  As part of his registration, Plaintiff Ezpeleta affirmatively agreed to Lawline's Terms & Conditions and Privacy Policy, which govern the collection and use of customer information. Hernandez Decl. ¶ 16.  At no point during his use of Lawline's platform did he raise concerns or complaints regarding data privacy or the alleged disclosure of his information to third parties. *Id.* Lawline's records do not reflect any prior communication from him objecting to its data practices. *Id.*

Plaintiff Ezpeleta alleges that, during his use of Lawline's video content, he had a Facebook account and an associated FID. Dkt. 31, ¶¶ 16, 18. However, he fails to specify whether he accessed Lawline's content while logged into Facebook or on the same web browser and device through which he (and not another user) was logged into Facebook. *Id.* ¶¶ 15-21. He also does not state whether any browser settings, extensions, or privacy tools may have blocked or restricted the Meta Pixel's ability to track his activity. *Id.*

Plaintiff Ezpeleta does not allege that he suffered any actual harm, financial loss, or misuse of his information as a result of the alleged information disclosure. *Id.*

### 3.     Plaintiff Vaughn Bobb-Willis

Plaintiff Vaughn Bobb-Willis ("Plaintiff Willis") first accessed Lawline's services in May 2021 by enrolling in a free course. Dkt. 31, ¶ 24; Hernandez Decl. ¶ 17. He later used a 10-day free trial in September 2023 before starting a paid subscription in October 2023. Dkt. 31, ¶ 24;

Hernandez Decl. ¶ 17. As part of his registration and subscription, Plaintiff Willis expressly agreed to Lawline's Terms & Conditions and Privacy Policy, which govern the collection and use of customer information. Hernandez Decl. ¶ 17.  At no point during his use of Lawline's platform did Plaintiff Willis raise any concerns or complaints regarding data privacy or the alleged disclosure of his information to third parties. *Id.*  Lawline's records confirm that Plaintiff Willis never communicated any privacy-related concerns prior to this litigation. *Id.*

Plaintiff Willis alleges that he had a Facebook account and an associated FID at all relevant times. Dkt. 31, ¶ 23. However, he fails to specify whether he accessed Lawline's content while logged into Facebook or on the same web browser and device through which he (and not another user) was logged into Facebook. Dkt. 31, ¶¶ 22-28.  He also does not state whether any browser settings, extensions, or privacy tools may have blocked or restricted the Meta Pixel's ability to track his activity. *Id.*

Critically, Lawline stopped running Facebook advertisements and therefore stopped using the Meta Pixel to assist it in running ads on Facebook in September 2022, well before Plaintiff Willis began his paid subscription in October 2023. Hernandez Decl. ¶ 4. While the Meta Pixel was inadvertently left on the site until it was removed in September 2024 and January 2025, Plaintiff Willis does not allege when, where, or how his specific data was purportedly shared during his use of Lawline's services. Dkt. 31, ¶¶ 22-28; Hernandez Decl. ¶¶ 4, 17. The absence of such allegations is fatal to his claim. Additionally, Plaintiff Willis does not allege that he suffered any actual harm, financial loss, or misuse of his information as a result of the alleged disclosure. Dkt. 31, ¶¶ 22-28.

### C.    Alleged Statutory Violations

Plaintiffs allege that Lawline disclosed users' PII, including Facebook IDs, subscription information, and video viewing information, to Meta in violation of the VPPA.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(1)

To establish Article III standing, a plaintiff must show that he or she has: "'(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 120 (2d Cir. 2021) (citations omitted). The injury in fact "must [be] 'concrete and particularized'" and "'actual or imminent, not conjectural or hypothetical.'" *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

At the pleading stage, "the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001). A facial challenge must rely solely on the allegations in the complaint. *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). In a fact-based challenge, on the other hand, the defendant may "'proffer[] evidence beyond the [p]leading.'" *Id.* (citation omitted). Plaintiffs must then either "come forward with evidence of their own to controvert that presented by the defendant" or "rely on the allegations in the [p]leading." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016). If "'jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 183 (S.D.N.Y. 2017) (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)); *see also Broidy Cap. Mgmt. LLC v.*

*Benomar*, 944 F.3d 436, 444 n.7 (2d Cir. 2019) ("deferral of a jurisdictional issue until trial is an extremely unusual situation" (internal quotation marks and citation omitted)).

### B.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In deciding a Rule 12(b)(6) motion, the court may consider documents incorporated by reference. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." (internal citations omitted)). Documents are deemed incorporated where they are "quoted in the complaint," *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 285 n.25 (S.D.N.Y. 2005), or are "documents that the plaintiff either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *see also Derbaremdiker v. Applebee's Int'l, Inc.*, No. 12-CV-01058(KAM), 2012 U.S. Dist. LEXIS 138596, at *10-12 (E.D.N.Y. Sept. 26, 2012), *aff'd*, 519 F. App'x 77 (2d Cir. 2013) (screenshots of defendant's website "quoted in . . . the complaint" are deemed incorporated). Where the contents of a "'website are at the center of [a plaintiff's] allegations[,]'" the website "is incorporated by reference." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 693 n.3 (S.D.N.Y. 2009) (citations omitted). The contents of the website are assumed to be accurately depicted, and the Court may conduct its "own review" of the website. *Id.*; *see, e.g., Thorn v. Formula 1 Motorsports, Inc.*, No. 19-CV-1077

(JPO), 2019 U.S. Dist. LEXIS 220080, at *6 n.2 (S.D.N.Y. Dec. 19, 2019) (reviewing incorporated website to determine plausibility of pleadings).

## IV.     ARGUMENT

### A.     Plaintiffs Lack Standing

Plaintiffs fail to allege a concrete injury-in-fact under Article III. Courts have held that VPPA violations must demonstrate a specific privacy injury, such as wrongful disclosure of video-watching history. *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666-67 (S.D.N.Y. 2015). Plaintiffs' vague assertions do not meet this standard.

Plaintiffs allege that "when a consumer requests or obtains a specific video from Defendant's website, the Meta Pixel technology that Defendant intentionally installed on its website transmits the consumer's personally identifying information and detailed information concerning the specific interactions the consumer takes on its website (including the consumer's Private Viewing Information revealing the specific videos that he or she requested and/or obtained) to Meta." Dkt. 31, ¶ 40. However, Plaintiffs lack Article III standing because they have not suffered any injury in fact. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "codifies a context-specific extension of the substantive right to privacy" (emphasis omitted)). The alleged privacy injury is demonstrably false both on the face of the SAC and in light of the actual transmission of data to Facebook via use of the Meta Pixel.

Courts have held that "the VPPA creates a right to the privacy of one's video-watching history, the deprivation of which--through wrongful disclosure, or statutory violation, alone--constitutes an injury sufficient to confer Article III standing." *Austin-Spearman*, 98 F. Supp. 3d at 666-67 (citing *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For purposes of Article III standing, the VPPA offers protection for a very narrow privacy right.

Plaintiffs attempt to establish a specific privacy injury through a screenshot of one of Lawline's course pages, which purportedly reflects information sent to Facebook via a "GET Request" when a user visits a Lawline.com webpage with the URL https://www.lawline.com/course-center/exploring-emerging-trends-in-maritime-sanctions/on-demand. Dkt. 31, ¶ 53. Plaintiffs claim the image reveals the title of the video segment allegedly viewed when a user visited the page containing the course. However, all that Lawline.com is disclosing is the URL. Disclosure of the title of an article or webpage to Facebook does not invade "the privacy of one's video-watching history," the only possible injury in fact under the VPPA. *Austin-Spearman*, 98 F. Supp. 3d at 666.

Under Meta Pixel's default settings—which were retained by Lawline—data is transmitted only when a webpage is loaded. Hernandez Decl. ¶ 9; *see* Declaration of Joshua Briones ("Briones Decl.") ¶ 4. Though the SAC highlights a "Pause" button (Dkt. 31, ¶ 53), the SAC fails to clarify that the code in question simply outlines that a pause button exists on the page and does not indicate whether the pause button was used. Hernandez Decl. ¶ 11. Lawline user's interactions with video content are not captured or transmitted to Facebook. *Id.* The GET Request transmits data to Facebook only when a webpage is loaded on Lawline.com, and no additional GET requests are triggered by user interactions with videos, such as playing, pausing, or skipping content. *Id.* ¶¶ 7-10. No information about whether a user plays, pauses, or fast-forwards video content is sent to Facebook. *Id.* ¶¶ 10-12. Plaintiffs have not experienced an injury in fact and, thus, have no standing. *See Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12, 15-16 (2d Cir. 2017) (dismissing claim for lack of injury in fact where plaintiffs' and defendant's activities demonstrated "[n]o reasonable person … would believe" defendant's presentation of their face scan technology "resulted in plaintiffs' biometric data being used or disclosed without their

consent"). Because Plaintiffs fail to demonstrate standing and could not do so under any set of facts, this Court lacks jurisdiction over the claims and should dismiss the SAC without leave to amend. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008).

### B.    Plaintiffs Fail to Properly Allege a Violation of the VPPA.

Only a "video tape service provider" who "*knowingly* discloses" PII is liable under the VPPA. 18 U.S.C. § 2710(b)(1) (emphasis added). PII must specifically identify a person as having requested or obtained "specific video materials or services." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015). "[T]he information disclosed by a video tape service provider must, *at the very least, identify a particular person—not just an anonymous individual*—and connect this particular person with his or her viewing history." *Id.* at 179 (emphasis added).

Plaintiffs fail to state a claim under the VPPA because 1) Plaintiffs fail to sufficiently allege that any disclosure was *knowing*, and 2) the allegedly disclosed information is not PII because it does not identify a person or any specific video requested or obtained by a person.

### 1.    Plaintiffs Fail to Allege That Lawline *Knowingly* Transmitted PII.

The VPPA states that PII "'includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider.'" 18 U.S.C. § 2710(a)(3). As a threshold matter, Plaintiffs fail to allege a *knowing* disclosure—i.e., that Lawline knew it was disclosing to Facebook both user identities and the Lawline.com videos they had watched and that Facebook was putting that information together. "[T]he term 'knowingly' connotes actual knowledge. It is not enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing.'" *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (citing 18 U.S.C. § 2710(b)(1)). "[T]he

-10-

knowledge element of the VPPA violation is intertwined with the definition of PII. If [the defendant] did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017). ""'[K]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code[,]'" or the defendant's knowledge of such code transmission. *Hulu*, 86 F. Supp. 3d at 1095 (citation omitted). Plaintiffs' allegation that Lawline decided incorporated the Meta Pixel into Lawline.com is insufficient and fails to rise "'above the speculative level,'" *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 88 (S.D.N.Y. 2022) (citations omitted).

Plaintiffs' claim that Lawline transmitted their PII to Meta hinges on the assumption that the mere presence of the Meta Pixel on Lawline's website resulted in automatic data disclosure. This assumption is flawed. The reality is that the transmission of any personal viewing information to Meta would have been contingent upon several preconditions, none of which Plaintiffs sufficiently allege. First, for any potential data transmission to occur, the subscriber must have been logged into Facebook at the time they accessed Lawline's website. Hernandez Decl. ¶ 13. The Meta Pixel would not associate a user with specific activity unless the user's Facebook session was active in the same browser. *Id.* Second, even if Plaintiffs were logged into Facebook, transmission would only have been possible if they accessed the video content using the same browser and device on which they were logged into Facebook. *Id.* If a subscriber viewed Lawline content on a work computer or a mobile device while their Facebook session was active on a personal laptop or another device, no transmission of their viewing information could have occurred. *Id.* Third, the possibility of transmission was dependent on whether the browser's

settings permitted Meta Pixel activity and whether any other browser-related components blocked the data transmission. *Id.* Ad blockers, cookie settings, and privacy-focused browser configurations could have prevented data transmission, even if the Meta Pixel was present on Lawline.com. *Id.* The SAC presumes that the Meta Pixel functioned in a vacuum, automatically collecting and transmitting PII to Meta regardless of the user's browser settings, session state, or device configuration.

Furthermore, there are no well-pleaded allegations that Lawline had knowledge that: (a) Lawline.com users with Facebook accounts would allow Facebook to incorporate cookies into their browsers; (b) Facebook would pair the c_user cookie information with the webpage URL information (if it ever did); or (c) Facebook would navigate to that page URL, find a video clip (if there was one), and infer that a particular user watched the clip (if the user ever did). Mere speculation does not create a well pleaded allegation of knowledge.

Plaintiffs' allegations align with how cookies generally work. A cookie is a small text file stored on a user's browser that "'just sits on the browser and gets sent along with information that would otherwise be sent.'" *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 142 (3d Cir. 2015) (citation omitted); *see also In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 14 (1st Cir. 2003); *In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 840 (N.D. Cal. 2017), *rev'd in part sub nom., In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020). The Meta Pixel relies on Meta's FID cookies placed by Meta on *a user's browser*. Meta's Cookie Policy states, "[c]ookies are small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones and other devices."[3] Once the FID cookie is installed on a user's browser, that small text file containing

---

[3] *See* Facebook Cookies Policy, https://www.facebook.com/policies/cookies/ (last visited February 25, 2025).

the user's FID is sent directly from the Meta Pixel to Meta whenever the browser communicates with Meta's server. Any information communicated from the cookie entirely bypasses the relevant third-party website, like Lawline.com. When a user's event data is transmitted to Meta, Meta knows the user's FID only because it is reading that information from *its own* cookie.

In *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd,* 745 F. App'x 8 (9th Cir. 2018), the court dismissed claims related to Meta's collection of the plaintiffs' web browsing activity on several healthcare websites using Meta's Business Tools, such as the Meta Pixel. The court found that the plaintiffs' claims were barred because they had consented to Meta's receipt of such metadata when they, like every Facebook user, signed up for Facebook accounts and agreed to its Cookies Policy and Privacy Policy, which "discloses the *precise conduct at issue*." 262 F. Supp. 3d at 953-55 (emphasis added). On appeal, the Ninth Circuit agreed with this dispositive conclusion. *Smith v. Facebook, Inc.*, 745 F. App'x at 8-9.

Because Section 2710(b)(1) of the VPPA is only implicated if the "video tape service provider . . . *knowingly* discloses" otherwise protected information, Plaintiffs themselves are admitting that the Meta Pixel, not Lawline.com, is transferring data, if any, to Meta—which Plaintiffs themselves consented to when getting a Facebook account. Plaintiffs cannot sign up for a Facebook account and then cry wolf when Meta collects information from their browsers about their off-site Facebook activity when that was exactly what Plaintiffs signed up for when they registered for their Facebook accounts.

### 2.    The SAC Fails to Allege Plaintiffs' Facebook Profiles Identify Them Individually or Are Public.

The SAC lacks any facts to support Plaintiffs' allegations that Facebook accounts personally identify them or that an "ordinary person" could find and link an FID to them. Simply

put, an FID cannot identify a person unless their Facebook profile is both *public* and *contains personally identifiable information*. *See, e.g.*, *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 856-57 (C.D. Cal. 2024). In *Heerde*, plaintiffs alleged that a college athletics website violated the VPPA by disclosing the plaintiffs' FIDs and video viewing information to Meta. *Id.* at 854. The court held that plaintiffs did not "allege their PII was disclosed because they [did] not identify what information on their Facebook pages, if any, was viewable and could be used to identify them." *Id.* at 858; *see also Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) ("[P]laintiffs' allegations are inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses."); *Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1307-08 (N.D. Fla. 2023) (finding plaintiffs did not state a claim for VPPA violation where the complaint offered "only threadbare recitals that [the plaintiffs'] 'profile[s] included personally identifiable information[,]'" and "'contain[ed] no allegation as to what information was actually included on [their] profile[s],' such as their names or birthdays." (second and last alterations in original) (citations omitted); *Solomon v. Flipps Media, Inc.*, No. 22-cv-5508 (JMA) (JMW), 2023 U.S. Dist. LEXIS 176480, at *8-9 (E.D.N.Y. Sept. 30, 2023) ("Plaintiff needed to allege that her public Facebook profile page contained identifying information about her in order to state a plausible claim. As her complaint says nothing about any personal information on her public Facebook profile page, her VPPA claim fails."); *Smith v. Trinity Broad. of Texas, Inc*, No. 8:24-cv-01046-JVS-ADS, 2024 U.S. Dist. LEXIS 176039, at *7 (C.D. Cal. Sept. 27, 2024) (dismissing VPPA claim because plaintiff "does not indicate that her profile is public and contains any identifying information or photos. Rather than allege what is on her personal Facebook profile, Smith merely states that the FID is PII ….").

Plaintiffs' allegations in this case are no different from those in *Heerde*. Plaintiffs' Complaint, First Amended Complaint, and now Second Amended Complaint have all failed to indicate whether Plaintiffs' Facebook accounts personally identified them or were public. Based on Plaintiffs' allegations, they could have been logged into a fake account, a private account, or a business account. Plaintiffs fail to properly plead that anyone could have located their Facebook profiles or that their Facebook profiles contain sufficient PII.

Meta allows users to further control how much information they provide on their Facebook profiles, how much information is displayed, and who can see that information. *See Heerde*, 741 F. Supp. 3d at 857-58 (noting that "private profiles may not be viewable even if someone has the FID") (citing *control who can see your Facebook page*, Facebook, https://www.facebook.com/help/150193685051184/). Plaintiffs' generic allegations that they each had a Facebook account during the relevant time period is simply not sufficient to state a claim that any PII was disclosed. Plaintiffs' allegations do not account for Plaintiffs having accounts in different names that do not personally identify them, or accounts are not discoverable by an "ordinary person" because they are set to private. The SAC fails to allege that a person accessing any of Plaintiffs' accounts simply by using an FID would discovery *any* PII. The SAC also fails to allege that any of Plaintiffs' accounts are publicly accessible rather than set to private. Plaintiffs' omissions are fatal to their claim. The SAC must be dismissed.

### 3. Information at Issue is Not PII Because It Does Not Identify "Specific Video Materials or Services."

Plaintiffs allege that Lawline transmitted general page titles and URLs, but such information does not identify specific video materials. In *Martin v. Meredith Corp.*, this Court held

that URLs indicating general webpage activity are insufficient to constitute PII. 657 F. Supp. 3d 277, 285 (S.D.N.Y. 2023).

The only data transmitted by Lawline to Meta Pixel was limited to generalized, hashed user activity (*e.g.*, page views) for purposes of optimizing advertising. Hernandez Decl. ¶¶ 4, 6, 14. Furthermore, Lawline's Privacy Policy explicitly states, "[w]e will not disclose your name and address, along with the title, description, or subject matter of any audiovisual materials you have viewed on our Website, unless you opt-in to such disclosure."[4] This provision directly negates Plaintiffs' allegations of unauthorized video history disclosure.

In *Martin v. Meredith Corp.*, this Court dismissed a VPPA claim based on allegations that Dotdash Meredith, the parent company of People.com, unlawfully disclosed plaintiff William Martin's video viewing information to Facebook through the use of Facebook Pixel. 657 F. Supp. at 285. Martin alleged that Dotdash Meredith's use of Facebook Pixel to transmit general URLs, which included video content, to Facebook constituted a violation of the VPPA, as it supposedly disclosed his PII in connection with his video viewing history.

The court, however, disagreed with Martin's interpretation of what constitutes PII under the VPPA. The court noted that under the VPPA, PII must directly link an individual to specific video content requested or obtained by that individual. In dismissing the claim, the court emphasized that the data transmitted through Facebook Pixel did not include sufficient detail to identify Martin as having requested or obtained a specific video. Instead, the data was limited to general URLs, which could indicate the presence of a video but did not conclusively identify Martin as having watched any particular video.

---

[4] Lawline, Privacy Policy, available at https://www.lawline.com/info/privacy-policy#:~:text=We%20will%20not%20disclose%20your,opting%2Din%20to%20such%20disclosure (last modified Sept. 11, 2023).

The court's reasoning was that a mere URL associated with a general webpage, even if it includes a video, does not satisfy the VPPA's requirement for PII. The court reasoned that "[s]imply sending a URL of a People.com webpage which may or may not include a video does not show that a person requested or obtained specific video materials or services." *Martin*, 657 F. Supp. at 285. The court added that even when a webpage included a video, "sending the URL does not identify a person as having requested or obtained the video on that page since the person may instead have merely reviewed an article on the page or opened the page and done nothing more." *Id.* The user could have merely opened the page without engaging with the video content, or the page could have contained other content unrelated to video. This level of specificity is crucial under the VPPA. The court highlighted that to sustain a claim under the VPPA, the data disclosed must unequivocally establish both the identity of the user and their engagement with a particular video. In *Martin*, the data provided to Facebook did not go beyond a generic URL that could be associated with various content types, failing to meet the VPPA standard for actionable personal identification.

The ruling in *Martin* aligns with other cases, such as *Robinson v. Disney Online*, 152 F. Supp. 3d at 182, in which courts have required a clear connection between the data disclosed and the user's specific viewing history. The *Martin* decision supports Lawline's argument that, even if some generalized data about page views or URLs was shared with Meta, such data does not meet the VPPA's definition of PII.

Furthermore, the SAC points to the c_user field on Defendant's website. Dkt. 31, ¶ 53. The FID contained in the c_user cookie is a random string of numbers that <u>does not</u>, by itself, identify anyone. Hernandez Decl. ¶¶ 4, 14. Page views, c_user cookies, or aggregated URLs, which do not specifically identify individual users as having watched specific videos, fall short of VPPA

requirements. Hernandez Decl. ¶¶ 4, 6, 14. Plaintiffs' "disclosure" allegations are based on a string of numbers in the form of c_user=##########, which is not "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016).

In *In re Nickelodeon*, the types of information at issue were the plaintiff's IP address, a user's browser and operating system settings, and a computing device's unique device identifier. *Id.* at 281-82. The court held that "the expansion of privacy laws since the Video Privacy Protection Act's passage demonstrates that, whatever else 'personally identifiable information' meant in 1988, it did not encompass" these types of static digital identifiers. *Id.* at 286. Furthermore, unlike statutes that "gave the FTC authority to expand the types of information that count as personally identifying under that law," "[t]*he Video Privacy Protection Act ... does not empower an administrative agency to augment the definition of 'personally identifiable information' in light of changing circumstances or new technologies*. The meaning of that phrase in the Act is, it would appear, *more static." Id.* at 287 (emphasis added).

The court in *In re Nickelodeon* further explained that Congress's amendment of the VPPA in 2013 indicated Congress "was keenly aware of how technological changes have affected the original Act" and "[d]*espite this recognition, Congress did not update the definition of personally identifiable information in the statute." Id.* at 288 (emphasis added). "What's more, it chose not to do so despite … submitted written testimony that" specifically argued for "the addition of Internet Protocol (IP) Addresses and *account identifiers* to the definition of [personally identifiable information]." *Id.* (last alteration in original) (emphasis added).

Another example is the Ninth Circuit's decision in. The plaintiff in *Eichenberger v. ESPN, Inc.*, downloaded an ESPN channel app on his Roku device and later learned that ESPN had

disclosed the serial number of his device and information regarding the videos he watched to Adobe. 876 F.3d 979, 981 (9th Cir. 2017). The plaintiff in *Eichenberger* alleged that this disclosure to Adobe violated the VPPA because Adobe used the information to identify specific consumers by connecting the information "'with existing data already in Adobe's profile of th[ose] individual[s].'" *Id.* (alterations in original) (citation omitted). The court rejected Plaintiff's argument, because plaintiff improperly focused *on Adobe's* capabilities to combine various data sets, rather than determining whether the information that *ESPN provided alone* was sufficient to reveal both the person and their video viewing history. *Id.* at 985. The court reasoned that the serial number did nothing more than identify Roku users *as a pool* of possible video viewers, and identification of a specific user within that pool depended on Adobe's ability to pair the serial number with other information. *Id.*

Plaintiffs' FIDs in this case are no different from serial numbers in *Eichenberger*. *See Eichenberger*, 876 F.3d at 985 ("It is true that today's technology may allow Adobe to identify an individual from the large pool by using *other information*—as Plaintiff alleges. But the advent of the Internet did not change the *disclosing-party focus of the statute*." (emphasis added)). The court in *Eichenberger* made clear that an otherwise anonymous number assigned to a consumer is <u>not</u> the type of information that the VPPA intended to protect from disclosure. *See id.* (reasoning that a video-store manager would not violate the VPPA by disclosing to a third party that someone within the category of "a local high school teacher" had rented a particular movie, even if the third-party recipient happened to be a resourceful private investigator who could identify the specific teacher with great efforts).

A random string of numbers in an encrypted metadata stream will not permit an ordinary person to readily associate that data, by itself, with a specific individual. This Court should follow

the reasoning from *Nickelodeon*, and recently adopted by the Northern District of Florida in *Edwards*, that FIDs allegedly disclosed are <u>not</u> PII because they are merely <u>random numeric identifiers</u> that are automatically sent through a cookie file to a single company, which is different from the purposeful and public disclosures of actual names with video viewing history to the public at large. *See Edwards*, 697 F. Supp. 3d at 1308. "The classic example will always be a video clerk leaking an individual customer's video rental history," and "[e]very step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *In re Nickelodeon*, 827 F.3d at 286, 290. For these reasons, Plaintiffs' claims should be dismissed.

       4.       **The SAC Fails to Establish That An Ordinary Person Would Be Able to Identify Plaintiffs' Facebook Accounts With an FID.**

The SAC fails to allege any facts to support that an ordinary person would be able to ascertain Plaintiffs' FIDs or have knowledge of Plaintiffs' proposed process for identifying a person based on their FID. To establish a VPPA claim, Plaintiffs must allege that the disclosed information "'*readily* permit[s] an *ordinary person* to identify" the plaintiff and her viewing habits. *Edwards*, 697 F. Supp. 3d at 1307 (emphasis added).

The plaintiffs in *Edwards* brought a VPPA claim against a marketing company. *Id.* at 1301. In finding that the Complaint did not plausibly allege that the defendant disclosed the plaintiffs' PII, the court explained:

> Although Plaintiffs do allege that the . . . Website transmits metadata, which contains c_user IDs and "may" contain video titles, they offer no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles. The complaint only alleges in conclusory fashion that "[o]nce the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user."

*Id.* at 1307-08 (internal citations omitted). Plaintiffs' VPPA claim in this case fails for the same reasons, because it is not enough for the Complaint to make conclusory allegations that any ordinary person could learn the identity of the person to whom the FID corresponds . . . "*simply* by accessing the URL www.facebook.com/[unencryptedFID]." Dkt. 31, ¶ 51 (emphasis added). Nor is it sufficient to allege generally that the Meta Pixel disclosed Plaintiffs' FIDs, the title of the videos they watched and corresponding URLs in the form of query string parameters and cookie values. *Id.* ¶¶ 2, 3, 10, 50, 52, 97. The SAC makes no mention of the "facts explaining how [Meta] accesses that metadata, why doing so does not require technical expertise, or how much metadata [Meta] has to comb through to discover someone's [FID] and the video titles." *Edwards*, 697 F. Supp. 3d at 1307-08.

It is implausible that an "ordinary person" would be (1) able to decipher a string of metadata, (2) parse out one line of code in this stream as having a c_user ID number, (3) intuitively understand that this information is an FID, or an identifier at all, and (4) would then also know to simply insert that string of numbers into a specific URL to find a unique Facebook profile (assuming that profile is not private). And that would be the exercise to simply identify the person. But the VPPA would also require tying that particular person to the "specific video materials or services" "as having [been] requested or obtained" as well. 18 U.S.C. § 2710(a)(3).[5]

---

[5] Meta makes available to its users the specific "Off Facebook" event data that it has collected when users visit specific websites like Lawline.com. *See* https://www.facebook.com/off-facebook-activity. There is no excuse for Plaintiffs' generic and conclusory allegations when they have direct access to the data Meta collected, if any, when they visited Lawline.com.

C.    **Plaintiffs' Consent Was Obtained Via Lawline's Terms & Conditions And Privacy Policy.**

Plaintiffs claim Lawline did not obtain consent for sharing their data. However, Lawline's Terms and Conditions[6] and Privacy Policy make clear that by using the website, users consent to certain data practices, including third-party data sharing for marketing purposes. The Privacy Policy states: "By accessing or using this Website, you agree to this privacy policy," which Plaintiffs accepted upon registration. *See supra* note 3. The Member Account section of the Terms and Conditions reinforces this, stating that "[r]egistration data and certain other demographic information about you are subject to Lawline's privacy policy." *See supra* note 4. All three named Plaintiffs consented to these terms, which is required by Defendant in order to use the website.

Furthermore, Lawline's Terms and Conditions include a one-year statute of limitations for claims related to the website. The Terms and Conditions state, "[y]ou agree that … any claim or cause of action arising out of or relating to the Website and these Terms of Service must be filed within one (1) year of the date the cause of action arose, or be barred as untimely." *See* supra note 4. Since Lawline's Meta Pixel program ceased operation in September 2022, a court will likely find that Plaintiffs' claims are untimely under the Terms and Conditions. *Executive Plaza, LLC v. Peerless Ins. Co.*, 5 N.E.3d 989, 989 (N.Y. Ct. App. 2014) ("'An agreement which modifies the [S]tatute of [L]imitations by specifying a shorter, but reasonable, period within which to commence an action is enforceable ….'"). Reasonableness is considered "'in view of the circumstances of each particular case.'" *Id.* at 992. New York courts have found one-year limitations clauses to be reasonable. *See Corbett v. Firstline Sec., Inc.*, 687 F. Supp. 2d 124, 128 (E.D.N.Y. 2009).

---

[6] Lawline, Terms and Conditions, https://www.lawline.com/info/terms-and-conditions (last updated July 17, 2024).

## V.    CONCLUSION

For the foregoing reasons, Defendant respectfully request that the Court dismiss the Second

Amended Complaint in its entirety with prejudice against Plaintiffs.


Dated:  February 28, 2025                      MINTZ LEVIN COHN FERRIS
                                               GLOVSKY AND POPEO, P.C.

                                               By _____
                                               Joshua Briones*
                                               Grecia Rivas-Rudra*
                                               2049 Century Park East. Suite 300
                                               Los Angeles, CA 90067
                                               Telephone: (310) 586-3200
                                               Facsimile:  (310) 586-3202
                                               jbriones@mintz.com
                                               grivas@mintz.com

                                               Erin E. Galliher
                                               919 Third Avenue
                                               New York, NY 10022
                                               Telephone: (212) 935-3000
                                               Facsimile:  (212) 983-3115
                                               eegalliher@mintz.com

                                               *Attorneys for Defendant FurtherEd, Inc. d/b/a
                                               Lawline*

                                               *Admitted Pro Hac Vice*

## <u>ATTORNEY CERTIFICATE OF WORD-COUNT COMPLIANCE</u>

Pursuant to Local Rule 7.1(c), Defendant specifies that the foregoing brief was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the brief, inclusive of headings and footnotes and exclusive of pages containing the caption, table of contents, the table of authorities, the signature block, and the certificate of compliance is words 6,756.

Dated:  February 28, 2025

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By _____
Joshua Briones*
Grecia Rivas-Rudra*
2049 Century Park East. Suite 300
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile:  (310) 586-3202
jbriones@mintz.com
grivas@mintz.com

Erin E. Galliher
919 Third Avenue
New York, NY 10022
Telephone: (212) 935-3000
Facsimile:  (212) 983-3115
eegalliher@mintz.com

*Attorneys for Defendant FurtherEd, Inc. d/b/a Lawline*

*\*Admitted Pro Hac Vice*

-24-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

_____
Joshua Briones