**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KAMILAH JOLLY; DIEGO ALVAREZ-MIRANDA EZPELETA; and VAUGHN BOBB-WILLIS; individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FURTHERED, INC. d/b/a LAWLINE, INC.,

Defendant.

Case No. 1:24-cv-06401-LJL

(*consolidated with Case No. 1:24-cv-06709*)

Hon. Lewis J. Liman

**DECLARATION OF RICHARD HERNANDEZ IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

I, Richard Hernandez, declare as follows:

1. I am the Chief Operating Officer ("COO") of FurtherEd, Inc. d/b/a Lawline ("Lawline"). I have served in various roles at Lawline, including Vice President of Product & Marketing and Chief Product Officer. I hold a Bachelor of Science in Business Administration from the University at Buffalo School of Management, The State University of New York. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2. My responsibilities at Lawline included overseeing the integration and operation of the Facebook Meta Pixel on Lawline's website. I am familiar with its functionality, including how and when data is transmitted to Facebook.

3. I have received and studied the Second Amended Complaint (Dkt. 31), in this matter. From my review of the Second Amended Complaint, I understand this lawsuit concerns the data allegedly sent to Facebook from the Lawline.com website ("Lawline") when a user visits that website. Specifically, the Plaintiff alleges that Lawline has installed the Facebook Meta Pixel, a piece of JavaScript code embedded on Lawline's webpages, which causes the user's browser to send certain types of data to Facebook when a user visits a Lawline webpage. Further, I understand that the users in this lawsuit are defined as those who "all persons in the United States who, during the relevant statutory period, requested or obtained a subscription to Defendant's website or video content from Defendant's website," ¶ 82, and "request[] or obtain[] a specific video from Defendant[]," ¶ 40, "while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc." ¶ 82.

4. Meta Pixel was implemented on Lawline's website in 2020 by third-party vendors to track user activity solely for advertisement performance. The third-party vendors recommended

setting up Meta Pixel to optimize advertisement performance. Lawline only utilized Meta Pixel via its Google Tag Manager, sending only basic information about specific events. Any user data was hashed and not personally identifiable. Lawline did not share cookie identifications or IP addresses. Lawline ended its relationship with these third-party vendors in September 2022 and stopped running advertisements on Facebook.

5. After that, the Meta Pixel was inadvertently left on the site until it was removed in September 2024 and January 2025.

6. Attached as **Exhibit A** is a screenshot from Tag Manager and Lawline's Application Code, which shows the data that was transmitting through the Meta Pixel script, which included: host name (Lawline), page view, and page title.

7. I supervised the implementation of the Meta Pixel on Lawline's website and understand the nature of the data collected and transmitted by the Meta Pixel. The data transmission occurs via two types of HTTP requests: GET and POST requests. Lawline's Meta Pixel configuration used only GET requests for transmitting data to Facebook, as seen in the Second Amended Complaint, ¶ 53, Figures 1-3.

8. Lawline at times also uses POST requests, which the Second Amended Complaint does not mention. A key difference between a GET request and a POST request is that a GET request can only send a limited amount of data to another website's server in the header and via parameters in the Uniform Resource Locator ("URL"). A POST request can, among other things, carry more data by enclosing its contents in the message body. A GET request shares less data while a POST request shares more data. Both types of requests are used for transmitting data between servers. The Meta Pixel on Lawline's website used only the GET method to request and send data to Facebook from the user's browser.

9. Under Meta Pixel's default settings—which were retained by Lawline—data is transmitted only when a webpage is loaded. No additional GET or POST requests are triggered by user interactions with videos, such as playing, pausing, or skipping content. Thus, user interactions with video content are not captured or transmitted to Facebook.

10. The Second Amended Complaint includes screenshots of "[e]xamples of a HTTP single connection session sent from the customer's device to Facebook" that the Second Amended Complaint says "reveals the fact that the user is viewing the online video 'Exploring Emerging Trends in Maritime Sanctions,' that they paused it in the process of viewing it, and the customer's unique personal identifiers including the FID (c_user field)." ¶ 53, Figures 1-3. While the Second Amended Complaint alleges that when a Lawline user watches these videos, a GET request then sends Facebook the title of the video viewed and whether the user paused the video in the process of viewing it, this is incorrect. A GET request does not share the title of the video; it only shares the URL of the page viewed.

11. The SAC also highlights a "Pause" button (Dkt. 31, ¶ 53), but the code in question simply outlines that a pause button exists on the page and does not indicate whether the pause button was used. Lawline user's interactions with video content are not captured or transmitted to Facebook.

12. Even if POST requests were utilized (which they were not for video interactions), they would only indicate the presence of embedded video content on a page and the general context of the page where the content resides. For example, POST requests might log that a webpage includes a video player but would not provide details about user actions, such as whether the video was started, paused, or skipped. Additionally, POST requests would not identify the specific video

content or its title, ensuring no detailed user behavior or video engagement information is captured or transmitted.

13. The transmission of any personal viewing information to Meta would have been contingent upon several preconditions. First, for any potential data transmission to occur, the subscriber must have been logged into Facebook at the time they accessed Lawline's website. The Meta Pixel would not associate a user with specific activity unless the user's Facebook session was active in the same browser. Second, even if Plaintiffs were logged into Facebook, transmission would only have been possible if they accessed the video content using the same browser and device on which they were logged into Facebook. If a subscriber viewed Lawline content on a work computer or a mobile device while their Facebook session was active on a personal laptop or another device, no transmission of their viewing information could have occurred. Third, the possibility of transmission was dependent on whether the browser's settings permitted Meta Pixel activity and whether any other browser-related components blocked the data transmission. Ad blockers, cookie settings, and privacy-focused browser configurations could have prevented data transmission, even if the Meta Pixel was present on Lawline.com.

14. The only data transmitted by Lawline to Meta Pixel was limited to generalized, hashed user activity (*e.g.,* page views) for purposes of optimizing advertising.

15. Plaintiff Kamilah Jolly became a paid member of Lawline in 2014, unsubscribed from email communications in 2017, and canceled her subscription to Lawline in February 2022. Upon registration, she accepted Lawline's Terms & Conditions and Privacy Policy. Lawline's records reflect no prior complaints or concerns raised by Plaintiff Jolly about the use or dissemination of her personally identifiable information prior to this litigation.

16. Plaintiff Diego Alvarez-Miranda Ezpeleta never paid for a subscription to Lawline.com. Plaintiff Ezpeleta accessed Lawline's services through a free trial account in 2021 and subsequently received a one-year scholarship for a subscription, which Lawline granted as a courtesy based on his representation of his finances. His subscription ended on November 2, 2022. Plaintiff Ezpeleta accepted Lawline's Terms & Conditions and Privacy Policy, and Lawline's records do not reflect any prior communication from him raising concerns about the collection and handling of his personally identifiable information.

17. Plaintiff Vaughn Bobb-Willis created his first Lawline account in May 2021 to access a free course. He subsequently used a free 10-day trial in September 2023 and started a paid subscription in October 2023—after Lawline stopped using Meta Pixel to assist it in running ads on Facebook in September 2022. Plaintiff Willis accepted Lawline's Terms & Conditions and Privacy Policy. Lawline's records indicate that Plaintiff Willis did not raise any prior concerns or complaints regarding the collection and handling of his personally identifiable information.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on 2/28/2025 | 6:51:36 AM PST in Ithaca, New York.

DocuSigned by:
Richard Hernandez
A7CE09A402BF430
Richard Hernandez

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Joshua Briones